**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| EBONY DAILEY<br>857 Cascade Rd.<br>Cincinnati, OH 45240 | )<br>)<br>)<br>) | CASE NO.<br><br>JUDGE: |
| Plaintiff, | )<br>) | |
| v. | )<br>) | **COMPLAINT FOR DAMAGES<br>AND INJUNCTIVE RELIEF** |
| SUNRISE TREATMENT CENTER, LLC<br>680 Northland Blvd.<br>Cincinnati, OH 45240 | )<br>)<br>) | **JURY DEMAND ENDORSED<br>HEREIN** |
| **Serve Also:**<br>Sunrise Treatment Center, LLC<br>c/o John R. Brinker (Stat. Agent)<br>414 Walnut St., Ste. 1220,<br>Cincinnati, OH 45202<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |

Plaintiff Ebony Dailey, by and through undersigned counsel, as her Complaint against the Defendant, states and avers the following:

**PARTIES**

1. Dailey is a resident of the city of Washington Court House, Fayette County, state of Ohio.

2. Defendant SUNRISE TREATMENT CENTER, LLC ("Sunrise") is a domestic company that conducts business in Ohio.

3. A substantial part of the events or omissions giving rise to Plaintiff's claims occurred at Sunrise's location at 680 Northland Blvd., Cincinnati, OH 45240.

4. At all times referenced herein, Sunrise was Dailey's employer within the meaning of Title VII of the Civil Rights Act of 1964 as Amended ("Title VII") 42 U.S.C §2000e, Family

and Medical Leave Act ("FMLA") 29 U.S.C. § 2617 et seq., and Ohio R.C. §4112.01(A)(2).

## JURISDICTION & VENUE

5. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Dailey is alleging a federal law claim under Title VII and the FMLA.

6. This Court has supplemental jurisdiction over Dailey's state law claims pursuant to 28 U.S.C. § 1367, as Dailey's state law claims are so closely related to her federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

8. Within 300 days of the conduct alleged below, Dailey filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC", Charge No. 473-2020-00659) against Sunrise ("EEOC Charge").

9. On or about October 26, 2020, the EEOC issued and mailed a Dismissal and Notice of Rights letter to Dailey regarding the EEOC Charge.

10. Dailey received her Dismissal and Notice of Rights from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit 1.

11. Dailey has filed this Complaint on or before the 90-day deadline set forth in the Dismissal and Notice of Rights.

12. Dailey has properly exhausted all administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

**FACTS**

13. Dailey is a former employee of Sunrise.

14. At all times noted herein, Dailey was qualified for and could fully perform the essential functions of her job, with or without a reasonable accommodation.

15. Dailey, as a female/woman, is in a protected class for her sex/gender and eventual pregnancy.

16. Dailey is also African American, and thus is also in a protected class for her race.

17. Dailey worked for Sunrise as an administrative assistant from on or about November 4, 2017 until Sunrise constructively terminated Dailey's employment on or about January 7, 2020.

18. The early portion of Dailey's employment was generally positive, or at least without significant issue.

19. Sunrise has a policy of no solicitation at work disallowing employees from selling things at work. This policy, however, is selectively enforced, generally, for the benefit of Sunrise's Caucasian employees.

20. Keri Durrough (administrative supervisor, Caucasian) was Dailey's supervisor at Sunrise for a large percentage of Dailey's employment.

21. In or around January 2018, Jordan (LNU, administrative assistant), was released from Sunrise.

22. In or around mid-February 2018, Durrough, due to the substantially increased workload, Durrough had a bit of a mental break. Durrough threw documents and paper around the office.

23. Dailey, in response to Durrough, reported Durrough to Regina Gullette (clinical director).

24. Dailey reported that she felt Durrough may have been overwhelmed and thus was acting out.

25. Dailey also went to Shane (LNU, administrative supervisor, Caucasian) to further report the situation.

26. Dailey also began taking some of Durrough's insurance verification work due to the volume and Durrough's other issues.

27. In or around April 2018, Sunrise had an opening for an administrative supervisor position to which Dailey applied and for which she was qualified.

28. Another woman, Rachelle Bertschinger (Caucasian), was chosen over Dailey.

29. Prior to Bertschinger's hire/promotion, Dailey met with Gullette about the promotion.

30. Dailey initially stated she did not want the role but was approached again later by Gullette.

31. Gullete approached Dailey multiple times on this issue, seemingly to try to intimidate her into applying for the position.

32. Dailey eventually changed her mind and stated she did wish to take the job, but Gullette told Dailey she would not receive an offer regardless.

33. Dailey questioned why, and Gullette stated that Dailey was "too quiet" and didn't "talk enough" for the job.

34. Dailey took this as a personal affront and one irrelevant to her job performance.

35. The conversation continued and Gullette began to pin the blame on Dailey's performance and implied Dailey should not even apply for the position.

36. Dailey applied anyway but was passed over for Bertschinger.

37. Dailey was interviewed, but Gullette told her Bertschinger would get the job once again.

38. Sunrise offered Dailey Bertschinger's previous role in place, but it came with only a nominal raise.

39. Dailey turned down the promotion as she felt it was an insulting consolation prize.

40. On or about October 4, 2018, Dailey began taking FMLA and/or short-term disability leave from Sunrise in order to cover her then-pregnancy.

41. Dailey was out from October 4, 2018 through to December 10, 2019 due to pregnancy complications.

42. Dailey worked for a few weeks after she returned, then was off from on or about January 14, 2019 through March 29, 2019.

43. Dailey had six weeks of maternity leave through Sunrise and received a short-term disability check from Reliance, Sunrise's short-term disability administrator.

44. Notably, Dailey's payments were lower than she was told due to her previous FMLA usage.

45. Rebecca Nelson (HR, Caucasian) did not keep Dailey fully updated on her FMLA and short-term disability time.

46. In or around mid-March 2019, Brett Richardson (director of HR, female/woman, African American) called Dailey to ask if she had planned on returning to Sunrise.

47. Dailey did, but she was unsure when due to her post-partum depression issues.

48. On or about March 19, 2019, Dailey received a letter from Sunrise noting she had exhausted her FMLA and that, if she wished to keep her job, she would need to return to work.

49. Sunrise however had already replaced Dailey with someone outside her protected classes prior to her return to work.

5

50. Dailey got back into contact with Richardson after she received the letter and noted she should still have FMLA days remaining; Richardson could not confirm or deny this.

51. On or about March 26, 2019, Dailey returned to work. Though she was not yet mentally ready, Dailey returned anyway for fearing of losing her job.

52. Bertschinger pulled Dailey into a meeting with Sunrise's new clinical director Dwight Richard (Caucasian, replaced Gullette in or around December 2018 or January 2019).

53. In that meeting, Sunrise wrote Dailey up for a policy violation: specifically, the "no solicitation at work" policy. They accused Dailey of performing an outside business transaction at work.

54. Dailey was in a conversation with coworkers about selling an extra water heater she happened to have, though she never actually sold the extra heater to any coworkers.

55. Dailey was not pleased with the write-up, but signed it anyway and Richard told her to take any concerns about it to HR.

56. Shortly after receiving the written discipline, Dailey reviewed the document and realized that numerous other employees had also broken the policy but were not disciplined for it.

    a. For example: Kim Hammond (addiction counselor, Caucasian) sold candle waxes, books, and the like on behalf of her daughter; Hammond was not disciplined.

    b. As another example: Judy (LNU, IOP facilitator, Caucasian) who was selling Advocare, some sort of weight loss supplement, at work; Judy was also not disciplined.

57. In response, Dailey filed a written complaint about disparate enforcement of policy to Sunrise, noting she felt targeted for her FMLA, race, recent pregnancy, and for more personal reasons. She asked that the discipline be removed.

6

58. On or about April 5, 2019, Dailey had a meeting with Richardson and Bertschinger about her complaint.

59. They stated that Dailey's discipline was rescinded for word from the CEO Steve Smith (Caucasian), but did not cite a specific reason why.

60. Dailey also received a performance evaluation in that meeting, it was overall negative.

61. The negativity of the evaluation surprised Dailey, as her previous evaluation was overwhelmingly positive, and she felt the low review retaliatory against her complaint and use of disability leave.

62. Dailey asked about the annual raise she expected as well, to which Richardson responded that Sunrise had given a cost-of-living adjustment to all employees, which was an approximately $3,000 raise for everyone.

63. Bertschinger also noted that Shane (LNU) prevented Dailey's raise because of the cost-of-living adjustment.

64. Notably, Dailey learned later that disparately, other employees had received both the cost of living and an annual raise, though she had not.

65. Dailey emailed Richardson on or about April 8, 2019, asking again about the lack of the raise and for a copy of the write-up; she received no response.

66. On or about May 15, 2019, Dailey had a meeting with HR and her boss. Sunrise apologized to Dailey for the lack of a raise and promised to grant it to her going forward.

67. In or around late May or early June 2019, Sunrise finally gave Dailey the raise it had promised her.

68. On or about November 8, 2019, Dailey had another performance evaluation with Bertschinger. It was generally quite negative but for obviously false reasoning.

7

69. Because of its falsity and the clear, continued disparate treatment from Sunrise, which evidently also bled into how Bertschinger treated Dailey, Dailey refused to sign the evaluation.

70. The evaluation primarily (and falsely) alleged that Dailey was unwilling to help her coworkers, had trouble with her basic alphabet, and had trouble with productivity percentiles.

71. Dailey, in response to the evaluation, informed Bertschinger that numerous charts were simply missing from the files, which led to issues with her productivity (she had to go chase the files down to bring them back) and alphabetizing (as files were placed in wrong spots by other employees, which Bertschinger blamed on Dailey).

72. Despite knowing that the evaluation was targeted to make her look as bad as possible, Dailey continued her serious efforts on improving her productivity anyway.

73. Dailey did, however, sign her document regarding a performance improvement plan ("PIP"), presented on the same day.

74. Dailey repeatedly reported to Sunrise the disparate treatment she felt for her race, pregnancy, and FMLA usage.

75. Sunrise promised to remedy these issues, but took enormous amounts of time to do so. Sunrise would have immediately fixed the issues for Dailey, were she Caucasian, not pregnant, and not an FMLA-user.

76. Dailey's issues did not begin until she began taking time off for her pregnancy and related issues.

77. Once she returned, Sunrise continued to treat her differently than her male and non-pregnant coworkers.

78. Dailey reported numerous issues of disparate treatment to Sunrise, but rather than remedying the problems, the company has given her empty promises.

79. Sunrise had several issues granting Dailey's full FMLA time and tried to cut it short by twice sending her letters of noting the FMLA's end.

80. The company, after Dailey's FMLA, then began taking adverse employment actions against her, including retaliatory performance evaluations and refusing to pay her raise for a substantial time period.

81. By 2020, Dailey had had enough of her disparate treatment and harassment from Sunrise.

82. On or about January 7, 2020, Dailey resigned from her employment with Sunrise due to the treatment she received.

83. Dailey was forced by Defendant's in/actions to resign her employment.

84. Any reasonable person in Dailey's place would also have no choice but to resign their employment.

85. Dailey's resignation was thus a constructive termination.

86. Defendant's constructive termination of Dailey was an adverse employment action against her.

87. As a result of Sunrise's acts and omissions Dailey has suffered damages.

**COUNT I: PREGNANCY DISCRIMINATION IN VIOLATION OF TITLE VII and THE PREGNANCY DISCRIMINATION ACT**

88. Dailey restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

89. Dailey is a member of a statutorily protected class based on her sex/gender and pregnancy under Title VII.

90. Dailey was qualified for and could fully perform the essential functions of her job.

91. During her employment with Sunrise, Dailey disclosed she was pregnant to Defendant.

92. Defendant had notice of Dailey's pregnancy.

93. Defendant treated Dailey differently than other similarly situated employees based on her pregnancy.

94. During her employment with Defendant, Dailey was subjected to offensive and harassing conduct based on her pregnancy from her superiors, coworkers, and customers.

95. Defendant knew or should have known of the harassing conduct against Dailey.

96. Defendant condoned, tolerated and ratified this harassing conduct.

97. This harassing conduct was severe and/or pervasive.

98. This harassing conduct was offensive to Dailey.

99. This harassing conduct would also be offensive to any reasonable person.

100. This harassing conduct interfered with Dailey's ability to perform her job duties.

101. This harassment was based on Dailey's disability.

102. This harassing conduct was so severe and pervasive that it materially altered the conditions of Dailey's employment.

103. Dailey, with no other reasonable choice, was then forced to resign her employment.

104. Any reasonable person in Dailey's place would also have no choice but to resign due to the conduct.

105. Dailey's resignation was a constructive termination, an adverse employment action.

106. Defendant constructively terminated Dailey's employment.

107. Defendant violated Title VII when it constructively terminated Dailey's employment based on her pregnancy.

108. Defendant's discrimination against Dailey based on her pregnancy violates Title VII.

109. As a direct and proximate result of Defendant's conduct, Dailey suffered and will continue to suffer damages.

**COUNT II: PREGNANCY DISCRIMINATION IN VIOLATION OF R.C. § 4112 et seq.**

110. Dailey restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

111. Dailey is a member of a statutorily protected class based on her sex/gender and pregnancy under R.C. § 4112 et seq.

112. Dailey was qualified for and could fully perform the essential functions of her job.

113. During her employment with Sunrise, Dailey disclosed she was pregnant to Defendant.

114. Defendant had notice of Dailey's pregnancy.

115. Defendant treated Dailey differently than other similarly situated employees based on her pregnancy.

116. Defendant discriminated against Dailey on the basis of her pregnancy throughout the end of her employment with the company.

117. During her employment with Defendant, Dailey was subjected to offensive and harassing conduct based on her pregnancy from her superiors, coworkers, and customers.

118. Defendant knew or should have known of the harassing conduct against Dailey.

119. Defendant condoned, tolerated and ratified this harassing conduct.

120. This harassing conduct was severe and/or pervasive.

121. This harassing conduct was offensive to Dailey.

122. This harassing conduct would also be offensive to any reasonable person.

123. This harassing conduct interfered with Dailey's ability to perform her job duties.

124. This harassment was based on Dailey's disability.

125. This harassing conduct was so severe and pervasive that it materially altered the conditions of Dailey's employment.

126. Dailey, with no other reasonable choice, was then forced to resign her employment.

127. Any reasonable person in Dailey's place would also have no choice but to resign due to the conduct.

128. Dailey's resignation was a constructive termination, an adverse employment action.

129. Defendant constructively terminated Dailey's employment.

130. Defendant violated R.C. § 4112 et seq. when it constructively terminated Dailey's employment based on her pregnancy.

131. Defendant's discrimination against Dailey based on her pregnancy violates R.C. § 4112 et seq.

132. As a direct and proximate result of Defendant's conduct, Dailey suffered and will continue to suffer damages.

**COUNT III: RACIAL DISCRIMINATION IN VIOLATION OF R.C. §4112, *et seq*.**

133. Dailey restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

134. Dailey is African American, and thus is in a protected class for her race.

135. R.C. § 4112 et seq. provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's race.

136. Defendant treated Dailey differently than other similarly situated employees based upon her race.

137. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by treating Dailey differently from other similarly situated employees outside her protected class.

138. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying their employment policies in a disparate manner based on Dailey's race.

139. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying their disciplinary policies in a disparate manner based on Dailey's race.

140. During her employment with Defendant, Dailey was subjected to offensive and harassing conduct based on her race from her superiors, coworkers, and customers.

141. Defendant knew or should have known of the harassing conduct against Dailey.

142. Defendant condoned, tolerated and ratified this harassing conduct.

143. This harassing conduct was severe and/or pervasive.

144. This harassing conduct was offensive to Dailey.

145. This harassing conduct would also be offensive to any reasonable person.

146. This harassing conduct interfered with Dailey's ability to perform her job duties.

147. This harassment was based on Dailey's race.

148. This harassing conduct was so severe and pervasive that it materially altered the conditions of Dailey's employment.

149. Dailey, with no other reasonable choice, was then forced to resign her employment.

150. Any reasonable person in Dailey's place would also have no choice but to resign due to the conduct.

151. Dailey's resignation was a constructive termination, an adverse employment action.

152. Defendant constructively terminated Dailey's employment.

153. Defendant violated R.C. § 4112 et seq. when it constructively terminated Dailey's employment based on her race.

154. Defendant's discrimination against Dailey based on her race violates R.C. § 4112 et seq.

155. Dailey incurred emotional distress damages as a result of Defendant's conduct described herein.

156. As a direct and proximate result of Defendant's acts and omissions, Dailey has suffered and will continue to suffer damages.

### COUNT IV: RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII

157. Dailey restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

158. Dailey is African American, and thus is in a protected class for her race.

159. Title VII provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's race.

160. Defendant treated Dailey differently than other similarly situated employees based upon her race.

161. Defendant violated Title VII by treating Dailey differently from other similarly situated employees outside her protected class.

162. Defendant violated Title VII by applying their employment policies in a disparate manner based on Dailey's race.

163. Defendant violated Title VII by applying their disciplinary policies in a disparate manner based on Dailey's race.

164. During her employment with Defendant, Dailey was subjected to offensive and harassing conduct based on her race from her superiors, coworkers, and customers.

165. Defendant knew or should have known of the harassing conduct against Dailey.

166. Defendant condoned, tolerated and ratified this harassing conduct.

167. This harassing conduct was severe and/or pervasive.

168. This harassing conduct was offensive to Dailey.

169. This harassing conduct would also be offensive to any reasonable person.

170. This harassing conduct interfered with Dailey's ability to perform her job duties.

171. This harassment was based on Dailey's race.

172. This harassing conduct was so severe and pervasive that it materially altered the conditions of Dailey's employment.

173. Dailey, with no other reasonable choice, was then forced to resign her employment.

174. Any reasonable person in Dailey's place would also have no choice but to resign due to the conduct.

175. Dailey's resignation was a constructive termination, an adverse employment action.

176. Defendant constructively terminated Dailey's employment.

177. Defendant violated Title VII when it constructively terminated Dailey's employment based on her race.

178. Defendant's discrimination against Dailey based on her race violates Title VII.

179. Dailey incurred emotional distress damages as a result of Defendant's conduct described herein.

180. As a direct and proximate result of Defendant's acts and omissions, Dailey has suffered and will continue to suffer damages.

**COUNT V: RETALIATION**

181. Dailey restates each and every prior paragraph of this complaint, as if it were fully restated herein.

182. As a result of the Defendant's discriminatory conduct described above, Dailey complained of the discrimination, harassment, and disparate treatment she was experiencing.

183. Subsequent to Dailey's complaints to management about harassment, bullying, and disparate treatment toward him, Defendant took adverse employment actions against Dailey, including constructively terminating her employment.

184. Defendant's actions were retaliatory in nature based on Dailey's opposition to the unlawful discriminatory conduct.

185. Pursuant to R.C. § 4112 et seq., the ADA, and Title VII, it is an unlawful discriminatory practice to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice.

186. As a direct and proximate result of Defendant's retaliatory discrimination against and discharge of Dailey, he has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

**COUNT VI: RETALIATION IN VIOLATION OF THE FMLA**

187. Dailey restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

188. During her employment, Dailey qualified for and took intermittent FMLA leave.

189. Defendant knew Dailey took FMLA leave.

190. After Dailey utilized her qualified FMLA leave, Defendant retaliated against her.

191. Dailey, as any reasonable person would in her circumstances, was forced to resign her employment by Defendant.

192. Dailey's forced-resignation was a constructive termination.

193. Dailey's constructive termination was an adverse employment action against her.

194. There was a causal link between Dailey's medical leave under the FMLA and Defendant's termination of Dailey's employment.

195. Defendant actually forced Dailey to resign for her FMLA use.

196. Defendant retaliated against Dailey by constructively terminating her employment.

197. Defendant's actions show that it willfully retaliated against Dailey in violation of U.S.C. § 2615(a).

198. As a direct and proximate result of Defendant's wrongful conduct, Dailey is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorney's fees.

## **DEMAND FOR RELIEF**

WHEREFORE, Dailey demands from Defendant the following:

a) Issue a permanent injunction:

    i. Requiring Sunrise to abolish discrimination, harassment, and retaliation;

    ii. Requiring allocation of significant funding and trained staff to implement all changes within two years;

    iii. Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

    iv.    Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    v.    Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) An award against Defendant for compensatory and monetary damages to compensate Dailey for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

c) An award of punitive damages against Defendant in an amount in excess of $25,000;

d) An award of reasonable attorneys' fees and non-taxable costs for Dailey's claims as allowable under law;

e) An award of the taxable costs of this action; and

f) An award of such other relief as this Court may deem necessary and proper.

        Respectfully submitted,

        __/s/ Matthew Bruce_____
        Matthew G. Bruce (0083769)
            Trial Attorney
        Evan R. McFarland (0096953)
        **THE SPITZ LAW FIRM, LLC**
        Spectrum Office Tower
        11260 Chester Road, Suite 825
        Cincinnati, OH  45246
        Phone: (216) 291-0244 x173
        Fax:   (216) 291-5744
        Email: Matthew.Bruce@SpitzLawFirm.com
        Email: Evan.McFarland@SpitzLawFirm.com
        *Attorneys for Plaintiff Ebony Dailey*

## **JURY DEMAND**

Plaintiff Ebony Dailey demands a trial by jury by the maximum number of jurors permitted.

/s/ Matthew G. Bruce
Matthew G. Bruce (0083769)